UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL A. McCLAIN,

Plaintiff,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 19-cv-12722

Hon. Linda V. Parker

Magistrate Judge Elizabeth A. Stafford

ERNST CHARARA & LOVELL, PLC.
Stephen M. Lovell (P80921)
Attorneys for Plaintiff
645 Griswold St., Suite 4100
Detroit, MI 48226
(313) 965-5555
stephen@ecllawfirm.com

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
Elizabeth Hardy (P37426)
Julia Turner Baumhart (P49371)
Ryan D. Bohannon (P73394)
Attorneys for Defendant
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
jbaumhart@khvpf.com
rbohannon@khvpf.com

**Ford Motor Company's Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56, Defendant Ford Motor Company moves for summary judgment on Plaintiff Crystal McClain's Title VII and ELCRA claims for race and sex discrimination, hostile work environment, and retaliation. Plaintiff's discrimination and retaliation claims fail because Ford took no adverse employment action against her. Her hostile work environment claims fail because (1) she does not show her harassment complaints were because of her race, sex, or in retaliation for protected activity, (2) her allegations do not rise to the level of objective severity or pervasiveness necessary to maintain a claim of actionable harassment, and (3) there is no dispute that Ford conducted a prompt, objective, and exhaustive investigation. Additionally, even though the investigation did not substantiate Plaintiff's claims of harassment based on a protected characteristic, to the extent it discovered that some of Plaintiff's co-workers had been disrespectful of her and had not adhered to the letter and spirit of Ford's "zero-tolerance" policy, the Company took corrective action designed to improve Plaintiff's workplace relationships and working environment.

Ford's counsel left Plaintiff's counsel messages, voicemails, and sent several emails, attempting to discuss the legal basis for this motion, as required by L.R. 7.1(a) and the Court's standing orders. After no response, on May 17, 2022, Ford's counsel sent Plaintiff's counsel a detailed email, explaining the nature of this motion and its legal basis. Plaintiff's counsel still did not respond, requiring this motion.

For the reasons provided in Ford's accompanying brief and exhibits, Ford respectfully requests that this Court enter an order granting it summary judgment and dismissing Plaintiff's complaint, in its entirety, with prejudice.

KIENBAUM HARDY VIVIANO PELTON
& FORREST, P.L.C.

By: *_/s/ Ryan D. Bohannon*
Elizabeth Hardy (P37426)
Julia T. Baumhart (P49371)
Ryan D. Bohannon (P73394)
Attorneys for Defendant
280 N. Old Woodward Ave, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
jbaumhart@khvpf.com
rbohannon@khvpf.com

Dated: May 26, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL A. McCLAIN,

Plaintiff,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 19-cv-12722

Hon. Linda V. Parker

Magistrate Judge Elizabeth A. Stafford

ERNST CHARARA & LOVELL, PLC.
Stephen M. Lovell (P80921)
Attorneys for Plaintiff
645 Griswold St., Suite 4100
Detroit, MI 48226
(313) 965-5555
stephen@ecllawfirm.com

KIENBAUM HARDY VIVIANO PELTON & FORREST, P.L.C.
Elizabeth Hardy (P37426)
Julia Turner Baumhart (P49371)
Ryan D. Bohannon (P73394)
Attorneys for Defendant
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
jbaumhart@khvpf.com
rbohannon@khvpf.com

**Brief Supporting Ford Motor Company's Motion for Summary Judgment**

**Statement of the Issues Presented**

1. Whether having a few allegedly contentious discussions with management about work issues are "adverse actions" that can be challenged in a Title VII/ELCRA discrimination or retaliation disparate treatment claim?

2. Whether complaints of "harassment" that are not supported by objective facts suggesting they are motivated by race, sex, or in retaliation for protected activity constitute actionable harassment?

3. Whether a few sexual pictures and comments, mild teasing, petty slights, and common workplace disputes are objectively severe or pervasive to constitute actionable harassment?

4. Whether Ford complied with Title VII and ELCRA when, in response to Plaintiff's complaints, it conducted a months-long investigation, interviewed 100 employees, took 40 witness statements, met with Plaintiff seven times, involved three HR professionals outside the Plant to confirm its findings, and even though it found no evidence to support Plaintiff's allegations, held training on its "zero tolerance" policy on a Plant-wide basis?

**Table of Contents**

Controlling Authorities .......... iv

Introduction .......... 1

Facts .......... 2

A. Plaintiff's hiring and transfer to the Woodhaven Stamping Plant. .......... 3

B. Plaintiff's initial complaints. .......... 4

C. Ford immediately investigates Plaintiff's complaints and stops the alleged race and sex harassment .......... 4

D. Plaintiff's complaints continue while she is on medical leave. .......... 6

E. Ford investigates further and decides to hold Plant-wide training to remedy the disrespectful conduct it substantiated .......... 7

F. Plaintiff submits more inflammatory, conclusory complaints; Ford interviews her, concludes there is nothing more to investigate, and moves forward with training under its "zero-tolerance" policy .......... 8

G. Plaintiff's complaints continue; Ford re-opens its investigation, interviews 80 employees, and calls in an HR professional from another Plant to interview Plaintiff. .......... 9

H. March 2019-June 2019: Plaintiff's unsupported complaints and Ford's investigation continue. .......... 11

Legal Standard .......... 14

Argument .......... 15

I. Ford took no adverse action against Plaintiff, requiring dismissal of her race and sex discrimination claims. .......... 15

II. Plaintiff cannot establish a hostile work environment. .......... 17

A. Plaintiff's allegations are not based on race or sex .......... 17

B. Plaintiff's allegations are not objectively severe or pervasive enough to survive summary judgment .......... 18

C. Ford took prompt, thorough, and continuing efforts to investigate and remediate Plaintiff's complaints. ....................21

III. Plaintiff cannot establish retaliation. ................................................23

A. Ford took no adverse action against Plaintiff. ..........................23

B. Plaintiff cannot show a retaliatory hostile work environment..24

Conclusion .........................................................................................25

## Controlling Authorities

### Cases

*Alexander v. Caresource*,
576 F.3d 551 (6th Cir. 2009) ......................................................................15

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...................................................................................14

*Aoyagi v. Straub Clinic & Hosp., Inc.*,
140 F. Supp. 3d 1043 (D. Haw. 2015)..........................................................14

*Bowman v. Shawnee State Univ.*,
220 F.3d 456 (6th Cir.2000) .......................................................................17

*Broska v. Henderson*,
70 F. App'x 262 (6th Cir. 2003).................................................................16

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)........................................................................... 18, 23

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)...................................................................................14

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001)...................................................................................18

*Clark v. United Parcel Serv., Inc.,*
400 F.3d 341 (6th Cir. 2005) ......................................................................19

*Collette v. Stein–Mart, Inc.,*
126 F. App'x. 678 (6th Cir. 2005)...............................................................21

*Ellison v. Clarksville Montgomery Cnty. Sch. Sys.*,
2019 WL 280982 (M.D. Tenn. Jan. 22, 2019) ..............................................22

*Ford v. Securitas Sec'y Servs. USA, Inc.*,
338 F. App'x 483 (6th Cir.2009) ................................................................15

*Hafford v. Seidner,*
183 F.3d 506 (6th Cir.1999) ....................................................................17

*Hawkins v. Anheuser–Busch, Inc.,*
517 F.3d 321 (6th Cir.2008) ........................................................ 21, 23, 24, 25

*Haynie v. Michigan Dep't of State Police,*
468 Mich. 302, 664 N.W.2d 129 (Mich. 2003) .............................................17

*Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*,
2011 WL 13137368 (S.D. Iowa Sept. 19, 2011) ...........................................16

*Kalich v. AT&T Mobility, LLC*,
679 F.3d 464 (6th Cir. 2012) ................................................................ 17, 18

*Khamati v. Sec'y of Dept. of the Treasury*,
557 Fed. App'x 434 (6th Cir. 2014) ............................................................23

*Laster v. City of Kalamazoo*,
746 F.3d 714 (6th Cir. 2014) ....................................................................25

*Lewis-Eazell v. Bd. of Educ. of City of Chicago*,
2008 WL 5100340 (N.D. Ill. Dec. 1, 2008).....................................................16

*Lindsay v. Pizza Hut of Am.,*
57 F. App'x 648 (6th Cir. 2003)...................................................................19

*McCombs v. Meijer, Inc.,*
395 F.3d 346 (6th Cir. 2005) ......................................................................21

*McDonnell-Douglas*,
411 U.S. 792 (1973)....................................................................................15

*McQuail v. Tenn. Tech. Univ.*,
69 F. Supp. 3d 701 (M.D. Tenn. 2014).........................................................24

*Meyer v. City of Ctr. Line*,
619 N.W.2d 182 (Mich. Ct. App. 2000).........................................................15

*Michael v. Caterpillar Financial Servs. Corp.*,
496 F.3d 584 (6th Cir. 2007) ................................................................ 15, 16

*Montgomery v. Honda of Am. Mfg., Inc.*,
47 F. App'x 342 (6th Cir. 2002) ....................16

*Mullins v. Goodyear Tire & Rubber Co.*,
291 F. App'x 744 (6th Cir. 2008) ....................22

*Mulvey v. Hugler*,
2017 WL 1737851 (E.D. Mich. May 4, 2017), *affirmed by* 2018 WL 2771346 (6th Cir. April 3, 2018) ....................24

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) ....................18

*Owen v. Peak*,
No. 3:02cv179, 2008 WL 4449011 (S.D. Ohio Sept. 26, 2008) ....................24

*Polonsky-Britt v. Yuba City Unified Sch. Dist.*,
2012 WL 5828513 (E.D. Cal. Nov. 15, 2012) ....................16

*Reed-Johnson v. Montgomery Cnty. Tennessee*,
2005 WL 2044868 (M.D. Tenn. Aug. 24, 2005) ....................22

*Regan v. Faurecia Auto. Seating, Inc.*,
679 F.3d 475 (6th Cir. 2012) ....................15

*Steward v. New Chrysler*,
415 F. App'x 632 (6th Cir. 2011) ....................15

*Stewart v. Esper*,
815 F. App'x 8 (6th Cir. 2020) ....................16

*Strickland v. City of Detroit*,
995 F.3d 495 (6th Cir. 2021) ....................20

*Watson v. City of Cleveland*,
202 F. App'x 844 (6th Cir. 2006) ....................15

*Williams v. General Motors*,
187 F.3d 553 (6th Cir. 1999) ....................19

*Worthy v. Materials Processing, Inc.*,
433 F. App'x 374 (6th Cir. 2011) ....................16

**Statutes**

Michigan's Elliot-Larsen Civil Rights Act .................... passim

Title VII of the 1964 Civil Rights Act .................... passim

**Rules**

Fed. R. Civ. P. 56(a)....................14

## Introduction

During the eight months at issue in this case, Plaintiff Crystal McClain, an hourly line worker at Defendant Ford Motor Company's Woodhaven Stamping Plant, complained about nearly every employee she worked with because she perceived petty slights, occasional teasing, and trivial disputes common to every workplace as "harassing." Ford promptly and thoroughly investigated each and every complaint brought forth by Plaintiff. Altogether, Ford interviewed more than 100 employees, took 40 witness statements, conducted seven formal interviews of Plaintiff, and found no evidence to substantiate Plaintiff's claims of discrimination, harassment, or retaliation. Despite having no legal obligation to do so, the Company then retrained all of Plaintiff's co-workers on proper workplace conduct, including reinforcement of its "zero-tolerance" policy.

Although Ford gave Plaintiff every chance to explain why the actions at issue should be considered racial, sexual, or retaliatory in nature, she could never do so (except in a few limited circumstances involving hourly co-workers). Additionally, the misconduct she described in her complaints was rarely corroborated by the witnesses she identified. And she frequently admitted, once the investigation was underway, that events had not unfolded as even she initially described.

In this lawsuit—claiming discrimination, a hostile work environment, and retaliation under Title VII of the 1964 Civil Rights Act and Michigan's Elliot-Larsen

Civil Rights Act—Plaintiff asks the Court to second guess Ford's exhaustive investigation and findings, even though she has not developed evidence to support her claims. Plaintiff admits Ford took no adverse action against her, requiring dismissal of her disparate treatment claims. As to her hostile work environment claims, Plaintiff cannot show the alleged "harassment" was because of her race, sex, or protected activity; her complaints do not rise to the level of objective severity or pervasiveness necessary for actionable harassment; and there is no dispute Ford complied with its obligations under Title VII and ELCRA by conducting a prompt, thorough, and objective investigation which confirmed Plaintiff's complaints could not be substantiated. As a result, Plaintiff's lawsuit must be dismissed.

**Facts**

This case centers on Plaintiff's 13 written complaints and seven interview statements from October 16, 2018 through June 12, 2019. (Exs. K-GG) Plaintiff repeatedly testified at deposition that these exhibits contain every incident she alleges was discriminatory or retaliatory, and *all* evidence she has to support her claims. (Ex. A, Pl Dep, 165, 171-3, 199, 219-222, 238-9, 281-4, 300, 302-4, 307, 319, 363-5, 368-9, 400-1) She also testified she did not know how Ford responded to her complaints because, during the eight months in question, she was absent 53% of the time. (*Id*. at 199-200, 307, 319-322; Ex. C, Mau Dec ¶ 5)

In total, Plaintiff complained about 50 incidents—mostly minor disputes with

co-workers and management, all of which cannot be accounted for in this brief. After each complaint, Ford's HR Team, led by HR Associate Michelle Mau, met with Plaintiff, took a signed statement, and followed every lead to investigate her allegations. Ms. Mau has provided a comprehensive Declaration that explains Plaintiff's complaints and what Ford did to investigate. (Ex. C) Attached as Appendix A to Ms. Mau's Declaration is a chart that separates Plaintiff's complaints and explains them and Ford's responses in detail. (Ex. C, ¶ 4, Tab 1) Despite interviewing all witnesses identified by Plaintiff and several dozen other witnesses, Ford's comprehensive investigation found no evidence to support her claims of discrimination, unlawful harassment, or retaliation.

**A. Plaintiff's hiring and transfer to the Woodhaven Stamping Plant.**

On March 26, 2012, Ford hired Plaintiff as an hourly line worker. (Ex. A, 71, 126, 130) She is a member of the UAW and the terms of her employment are governed by the CBA. (*Id*. at 130) On October 23, 2017, she transferred to Ford's Woodhaven Stamping Plant—where she is still employed today. (*Id*. at 132-7, 144; Ex. C, ¶ 60) In transferring, Plaintiff accepted relocation bonuses and signed agreements, in accordance with the CBA, that she would not transfer from Woodhaven until October 2020. (*Id*.; Ex. G; Ex. H)

Upon transferring, she and other transferees were trained on Ford's EEO policies, including where to make a complaint. (Ex. A, 144-5; Ex. C, ¶ 11-12) She

signed an acknowledgment that she received Ford's policy. (*Id*. at ¶ 12; Ex. I; Ex. J) She made no complaints during her first year at Woodhaven. (Ex. A, 161-4)

**B. Plaintiff's initial complaints.**[1]

In October 2018, Plaintiff submitted three complaints, filed an EEOC Charge, and signed three statements following interviews with Ms. Mau. (Ex. A, 161-260; Ex. B, Mau Dep, 14-32; Ex. C, ¶ 14, 22, 23, 26; Exs. K-Q) Plaintiff accused five co-workers of "bullying"—two of whom, Sam Casara and Adell Jones, she also accused of sexual harassment—and a supervisor, Kyle Kunec, of race discrimination. (*Id*.)

Plaintiff said Mr. Casara, on three consecutive days, talked about his sex life and showed her a picture of his pubic hair (but not penis) and a picture of a clitoris. (Ex. A, 161-260; Exs. K, L) She reported that Mr. Jones said, "how about you have AJ's nuts in your mouth." (Ex. A, 161-260; Exs. N, O) And she told Ms. Mau "the only time I felt discriminated against" was when Mr. Kunec asked her not to sit while working on the job.[2] (Ex. A, 161-260; Exs. K, L) Plaintiff's remaining complaints were not sexual or racial in nature. (Ex. C, Tab 1, # 1, 3, 9-14, 19, 22)

**C. Ford immediately investigates Plaintiff's complaints.**

After each written complaint, Ms. Mau immediately interviewed Plaintiff.

[1] A detailed explanation of each separate complaint in this section and Ford's response can be found at Ex. C, Tab 1, Incident # 1, 3-4, 6-14, 19-23.

[2] Plaintiff later admitted that since this one alleged incident, she has been able to sit like all other employees. (Ex. AA, p. 2)

(Ex. A, 161-260; Ex. B, 8, 15; Ex. C, ¶ 13-14, 22-23, 26, 34, 38, 49-50; Exs. L-O, W, Y) Following each interview, Plaintiff reviewed a written statement, had an opportunity to add or modify her statement, and confirmed the accuracy of the statement by signing. (*Id.*) She also told Ms. Mau that she did not want her co-workers disciplined in any way or even questioned about her complaints. (Ex. A, 210; Exs. L, M, O) Her only request was to be transferred out of Woodhaven. (*Id.*)

Within two weeks, Ford interviewed dozens of Plaintiff's co-workers, discussed the situation with Plaintiff's supervisors, and took 19 separate witness statements—including one from each employee Plaintiff identified as a witness. (Ex. B, 14-45; Ex. C, ¶ 16-21, 24-25, 27) The witnesses named by Plaintiff denied observing the vast majority of the conduct she complained about. (Ex. C, ¶ 17-20, 24-25, 27) A few co-workers told Ms. Mau that Plaintiff had trivial workplace disputes and reported mild teasing. (*Id.* at ¶ 21) One employee said co-workers—he didn't know who—nicknamed Plaintiff "Crazy Crystal" because she often acted odd—singing, dancing, and doing jumping jacks on the line. (*Id.*) At the conclusion of these interviews, Ford concluded that some of Plaintiff's co-workers had been mildly disrespectful of her, but that those issues were not related to her protected characteristics. (Ex. B, 22-5, 35-6; Ex. C, ¶ 27)

On November 2, 2018, Ms. Mau prepared a summary of her investigation and findings for HR Business Partner Flueretta Drummer at Ford's World Headquarters.

(Ex. C ¶ 27) In preparing the summary, Ms. Mau had multiple meetings with Woodhaven's HR Team, which consisted of Manager Dave Kamienecki and Associates Amber Cervantes and Emilia Iachim. (*Id*. at ¶ 15, 27-28)

Ms. Drummer suggested follow-up. (Ex. C ¶ 27) The Woodhaven HR Team interviewed dozens more and took an additional eight witness statements. (*Id*.) The Woodhaven HR Team, Ms. Drummer, and a second HR Business Partner, Donna Frank, then discussed the findings. (*Id*. at ¶ 28)

**D. Plaintiff's complaints continue while she is on medical leave.** [3]

In mid-November, while Ford's investigation continued, Plaintiff started a two-month medical leave. While on leave, she submitted three additional complaints, and amended her EEOC Charge. (Ex. A, 265, 280-4; Ex. C, ¶ 29; Exs. R-U) Her new complaints consisted of common workplace problems—like management asking her about failing to pull a body panel while working on the line, a dispute with a co-worker over what "spot" they were assigned to work, and alleged co-worker delays in relieving her from the line to use the restroom.[4] (Ex. C, ¶ 29-31; Ex. R) Although these complaints were about everyday issues that occur on a production line, Plaintiff characterized these slights as "pure hate and harassment,"

[3] A detailed explanation of the complaints discussed in this section can be found at Ex. C, Tab 1, Incident # 15-18, 25-30.

[4] Mr. Casara testified he experienced delays in being relieved to use the restroom. (Ex. D, 13) Several employees also told Ms. Mau it can take more than 30 minutes before they are relieved on the line for a restroom break. (Ex. C, ¶ 31)

being "singled out," "threatening," and said she feels "very scared for my physical safety in the building." (Ex. C, ¶ 29-31; Exs. R-T)

She also complained she overheard Mr. Jones say "I ain't got time for this crybaby bullshit" and Mr. Casara say "hey." (*Id.*) And she alleged a "hostile work environment" when a former manager had distributed mints to employees with a note that said, "Thank you for your Commit-MINT in Quality"— speculating this was somehow a Plant-wide joke about her bad breath. (Ex. C, ¶ 31; Ex. R.)

**E. Ford investigates further and decides to hold Plant-wide training to reinforce its "zero-tolerance" policy and its expectation that employees treat each other respectfully.**

Ms. Mau again led the HR Team to interview dozens of employees and take two follow-up witness statements. (Ex. C, ¶ 29-31) Manager Lorraine Diamond and Mr. Kunec explained to Ms. Mau that their discussions with Plaintiff were about work-related concerns commonly discussed with production workers. (*Id.* at ¶ 30) Ms. Mau also confirmed there was no evidence that Plaintiff's co-workers intentionally singled her out or delayed relieving her for restroom breaks and that Ford had not disciplined Plaintiff in any way. (*Id.*) At the conclusion of these interviews, Plaintiff's complaints were still unsubstantiated. (*Id.*) While the disciplining of employees was therefore not appropriate, Ford decided that it would schedule a Plant-wide Stand-Down to reinforce the conduct Ford expected of all Ford employees and re-emphasize its "zero-tolerance" policy. (*Id.* at ¶ 32)

**F. Plaintiff submits more inflammatory, conclusory complaints; Ford interviews her, concludes there is nothing more to investigate, and moves forward with training under its "zero-tolerance" policy.[5]**

On January 5, 2019, Plaintiff submitted her seventh written complaint to Ms. Mau. (Ex. A, 284-5; Ex. C, ¶ 33; Ex. V) It contained no new incidents, but recharacterized prior complaints as "sexual threats," "racial alienation," and "horrifying" discrimination and retaliation. (*Id.*) On January 22, 2019, Plaintiff returned from leave and Ms. Mau met with her to discuss the complaint. (Ex. A, 295-308; Ex. C, ¶ 34; Ex. W)

When asked what had occurred that supported her alarming claims of race discrimination, Plaintiff admitted her reference to "racially derogatory" conduct related to Mr. Kunec telling her she "couldn't sit down" while working on the line. (Ex. A, 296-7; Ex. C, ¶ 34; Ex. W) She also confirmed she had had no further contact with Mr. Casara or Mr. Jones, but inexplicably believed they "could rape me" and "might kill me." (*Id.*) While she admitted she had not actually been threatened, she claimed Mr. Kunec "looked at me like he wanted to kill me." (*Id.*) Regarding sexual touching, she claimed, a year earlier, she had cut herself on the line, an ambulance came, and someone (she didn't know whether it was a Ford or an EMS employee) pushed her into the back of the ambulance by her "butt cheeks." (*Id.*) Regarding

[5] A detailed explanation of the complaints discussed in this section can be found at Ex. C, Tab 1, Incident # 2, 31, 33.

"racial alienation," she again said Mr. Kunec told her not to sit while working on the line, which she characterized as "targeting and singling me out," "denying me my freedom to work with dignity," and "pulling out his whip." (*Id.*)

Because Ms. Mau had already investigated these complaints, Ford closed its investigation and, on January 22, 2019, held training for all employees in the Plant where it reminded everyone of proper workplace behavior and reinforced Ford's "zero-tolerance" policy, including how and where to make a complaint. (Ex. A, 289-94; Ex. C, ¶ 35)

**G. Plaintiff's complaints continue; Ford re-opens its investigation, interviews 80 employees, and calls in an HR professional from another Plant to interview Plaintiff.[6]**

A week later, Plaintiff submitted her eighth written complaint to Ms. Mau. (Ex. A, 308-11; Ex. C, ¶ 36-37; Ex. X) She complained that the Plant-wide rule about not having cell phones out while working on the line somehow singled her out—solely because she saw one white employee use ear buds. (*Id.*) She further complained Ms. Diamond singled her out by calling her into her office to discuss her violation of that rule—a conversation Ms. Diamond asked a UAW rep, Ms. Mau, and Ms. Iachim to witness. (*Id.*) Although Plaintiff was not disciplined for violating the rule, she complained that Ms. Diamond had "sabotage[ed] my water privilege

[6] A detailed explanation of the complaints discussed in this section can be found at Ex. C, Tab 1, Incident # 5, 32, 34-41, 43-45.

and my privilege to use the restroom," by denying Plaintiff's requests for a "buzzer" or "light" on the line to notify others when she needed something or to have a small table near the line for personal items like a water bottle, phone, and books. (*Id.*) She said Ms. Diamond had instituted "Jim Crow Retaliation" that "took me back to the racial segregation days of water fountains, and separate toilets." (*Id.*) She also cited five other minor workplace disputes as "confirm[ation] that I'm in danger."

In response, Ms. Mau immediately met with Plaintiff and took another signed written statement. (Ex. C, ¶ 38-39; Ex. Y) As before, Plaintiff provided no supporting evidence for her accusations.[7] (*Id.*) After the interview, the Woodhaven HR Team developed a plan to interview dozens of employees across the Plant to triple-check whether there was any merit to Plaintiff's complaints and arrange for an HR professional from another plant to meet with Plaintiff. (Ex. C, ¶ 40)

From February 11, 2019 through March 1, 2019, the Woodhaven HR Team spoke to 80 employees and found no evidence to support any of Plaintiff's allegations about intentional delays in bathroom breaks, bullying, not being able to use a water bottle, or being singled out in any way. (Ex. C, ¶ 40-42) On March 1 and 6, HR Associate Catina McCoy from Ford's Livonia Transmission Plant met with

[7] Ms. Mau made clear to Plaintiff that she was free to use a water bottle without fear of discipline. (Ex. A, 312-20; Ex. C, ¶ 39) Plaintiff subsequently admitted that everyone in the Plant, including herself, continued to use a water bottle. (Ex. AA, p. 5) Plaintiff also never complained again about delays in using the restroom.

Plaintiff for hours each day. (*Id*. at ¶ 43-45; Ex. A, ) After each interview, Plaintiff signed a written statement. (Ex. A, 321-322; Ex. C, ¶ 43-44; Exs. Z, AA) Plaintiff did not add anything new to her complaints, except to claim that eight months earlier in July 2017, a manager allegedly told her, "I know you want to talk to the union, but it can come back on you." (*Id*.) Because that manager had retired at this time, Ford could not investigate further. (Ex. C, ¶ 44)

Ms. McCoy confirmed Plaintiff had nothing to add to her complaints. (Ex. A, 321-6; Ex. C, ¶ 43) Plaintiff read the statements, ensured their accuracy, and signed them. (*Id*.; Exs. Z, AA) The Woodhaven HR Team met with Ms. McCoy and they agreed there was no evidence to support Plaintiff's complaints. (Ex. C, ¶ 46)

### H. March 2019-June 2019: Plaintiff's unsupported complaints and Ford's investigation continue.[8]

On March 13, 2019, Process Coach Jason Garcia moved Mr. Casara to Plaintiff's area when his line was shut down for safety reasons.[9] (Ex. A, 336-8; Ex. C, ¶ 47-50; Ex. BB) When Plaintiff returned from break, she went to Plant Medical. (*Id*.) Mr. Garcia asked why and Plaintiff repeated over and over, "They know what

---

[8] A detailed explanation of the complaints discussed in this section can be found at Ex. C, Tab 1, Incident # 24, 42, 46-58.

[9] Ms. Mau separated Plaintiff from Mr. Casara, Mr. Jones, and Mr. McMunn, all of whom confirmed this at their depositions. (Ex. B, 37; Ex. C ¶ 26; Ex. D, 13; Ex. E, 9-12; Ex. F, 12) While Plaintiff denies they were separated, March 13 was the only time she complained about having to work near any of them again. (Ex. A, 336-7; Ex. BB)

they did." (*Id.*) Plaintiff then started another medical leave and submitted her ninth written complaint to Ms. Mau about the incident. (*Id.*) She also complained about missing overtime on two days. (*Id.*)

Ms. Mau took a written statement from Mr. Garcia and determined the incident was an innocent mistake. (Ex. C, ¶ 49) She also checked Plaintiff's attendance records and confirmed her claim of lost overtime lacked merit—Plaintiff was offered and refused overtime on the days in question. (*Id.*) When Plaintiff returned from leave, Ms. Mau explained to her why her complaints had no merit and Plaintiff did not refute Ms. Mau's findings. (Ex. A, 337-8, 343; Ex. C, ¶ 50)

In June 2019, Plaintiff submitted more complaints of "Jim Crow racism tactics."[10] (Ex. A, 345-7; Ex. C, ¶ 51-52; Exs. CC-DD) But she added no new factual allegations, other than complaining about a job assignment—a seniority matter governed by the CBA.[11] (Ex. C, ¶ 39, 51-52)

In mid-June, Plaintiff submitted her last complaints. (Ex. A, 363-9, 374; Ex. C, ¶ 53-58; Exs. EE, FF) While seeking workers' compensation for an alleged wrist injury, she had a dispute with the Woodhaven Plant nurse, Kimberly Haupt-

---

[10] Unbeknownst to Ford, Plaintiff also sent more than 50 letters and emails to the EEOC—even accusing the EEOC Office of discrimination. (Ex. A, 384; Ex. II) Ford became aware of these complaints for the first time during this lawsuit.

[11] Plaintiff never filed a grievance over any of her complaints or related issues, such as overtime, job assignments, and failure to provide timely bathroom breaks—all of which were grievable events. (Ex. A, 356)

Velasquez. (*Id.*) Nurse Haupt-Velasquez evaluated Plaintiff's wrist and x-rays and reported they were normal. (*Id.*) Plaintiff accused her of discrimination.[12] (*Id.*) Plaintiff and Ms. Haupt-Velasquez went to HR, where HR Manager Mr. Kamienecki witnessed Plaintiff become "rude, accusatory, and inflammatory." (*Id.*)

On June 12, 2019, Plaintiff went on leave and testified she was totally disabled due to her wrist injury. (Ex. A, 94-101, 157-161, 349-350, 362, 371, 449; Ex. C, ¶ 56) She then sent multiple complaints to Ms. Mau and filed a second EEOC Charge about the incident with Ms. Haupt-Velasquez. (Ex. A, 363-9, 374; Ex. C, ¶ 53-58; Exs. EE, FF, HH) As before, Plaintiff's complaint exaggerated facts—accusing Mr. Kamienecki, for instance, of racism for trying to calm the situation by discussing the different Ford plants they both had worked at and asking her where she was from originally. (*Id.*) Ford took written statements from Nurse Haupt-Velasquez and Mr. Kamienecki, and determined Plaintiff's allegations had no merit. (*Id.*)

In September 2019, Plaintiff filed this lawsuit while still on leave. (ECF No. 1; Ex. C, ¶ 60) In March 2021, after discovery closed, Plaintiff attempted to add claims asserting disability discrimination, whistleblower retaliation, and public policy violations based mostly on allegations that post-date June 12. (ECF No. 36)

[12] Plaintiff testified this was disability discrimination, which is not a claim pending in this lawsuit. (Ex. A, 364)

The Court denied Plaintiff's motion on futility grounds.[13] (ECF No. 40) Plaintiff's pending claims assert race and sex discrimination (Counts II and V), hostile work environment (Counts III and IV), and retaliation (Counts I and VI). (ECF No. 45) For the reasons that follow, her claims are now ripe for dismissal.

**Legal Standard**

Under Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[13] While the Court allowed Plaintiff to amend to fix mistakes in her original Complaint, allegations post-dating June 12 cannot be raised in this suit because she identified June 12 as the "latest" date of alleged discrimination or retaliation in her EEOC Charges. (Exs. P, U, HH) *See*, *Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043, 1055 (D. Haw. 2015).

## Argument

### I. Ford took no adverse action against Plaintiff, requiring dismissal of her race and sex discrimination claims.

Plaintiff's disparate treatment claims must be dismissed because she cannot show she suffered an adverse action.[14] *Alexander v. Caresource*, 576 F.3d 551, 559 (6th Cir. 2009) (citation omitted). An "adverse action" requires Plaintiff to show a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012).

To show an adverse action, Plaintiff cannot rely on her "personal beliefs" or inflammatory "labels." *Steward v. New Chrysler*, 415 F. App'x 632, 640 (6th Cir. 2011) ("label" of "segregated assembly line" insufficient to establish an adverse action); *Watson v. City of Cleveland*, 202 F. App'x 844, 854 (6th Cir. 2006) (plaintiff's "personal belief" that she suffered adverse actions insufficient). Courts routinely hold that work-place disputes with no economic loss, like Plaintiff's

---

[14] Michigan courts rely on federal precedent interpreting Title VII to analyze ELCRA claims. *See, e.g., Meyer v. City of Ctr. Line*, 619 N.W.2d 182, 188-89 (Mich. Ct. App. 2000). Plaintiff admits she has no direct evidence to support her claims. (Ex. A, 306-7, 438-443; Ex. W) Because Plaintiff relies strictly on circumstantial evidence, the well-known burden-shifting framework set forth in *McDonnell-Douglas* applies. 411 U.S. 792 (1973); *Ford v. Securitas Sec'y Servs. USA, Inc.,* 338 F. App'x 483, 486 (6th Cir.2009) ("Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases.").

complaints here, are not "adverse actions." *See, e.g., Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) ("confrontation" in which "harsh words were exchanged" is not an "adverse action"); *Worthy v. Materials Processing, Inc.*, 433 F. App'x 374 (6th Cir. 2011) (holding allegation that employer "took away my right to go to the restroom" was not an adverse action); *Stewart v. Esper*, 815 F. App'x 8, 16-20 (6th Cir. 2020) (holding no adverse action, even though complaint included denials of certification, removal of meaningful work, inability to access assignments and promotions, and a supervisor's offensive behavior).

Applying these standards, Plaintiff lacks evidence of an adverse action. She concedes she was not discharged, demoted, or disciplined, and she did not lose any pay or benefits, and she did not experience a change in duties.[15] (Ex. A, 270, 350-1, 360; Ex. C, ¶ 59) She claims only a few contentious conversations with management

---

[15] Plaintiff claims economic loss from (1) taking medical leaves, and (2) two days of missed overtime. (Ex. A 352-4, 359) But voluntary medical leaves are not an adverse action. *Polonsky-Britt v. Yuba City Unified Sch. Dist.*, 2012 WL 5828513, at *6 (E.D. Cal. Nov. 15, 2012); *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 2011 WL 13137368, at *5 (S.D. Iowa Sept. 19, 2011); *Lewis-Eazell v. Bd. of Educ. of City of Chicago*, 2008 WL 5100340, at *3-4 (N.D. Ill. Dec. 1, 2008). And she fails to support her claim of lost overtime with supporting evidence. *See*, *e.g.*, *Broska v. Henderson*, 70 F. App'x 262, 268 (6th Cir. 2003) (holding no adverse action where plaintiff "put forth virtually no evidence on the overtime issue"); *Montgomery v. Honda of Am. Mfg., Inc.*, 47 F. App'x 342, 349 (6th Cir. 2002) (no adverse action because the plaintiff "has not produced evidence sufficient…as to whether he was denied overtime opportunities, or whether similarly situated [w]hite associates were given overtime opportunities that [plaintiff] was denied"). Ms. Mau investigated the days in question and found Plaintiff's claim had no merit. (Ex. C, ¶ 49, 52)

and other trivial matters that could not possibly result in tangible harm. Under *Michael*, *Worthy*, and *Stewart*, these minor incidents do not constitute an "adverse action." Plaintiff's discrimination claims must be dismissed.

**II. Plaintiff cannot establish a hostile work environment.**

In order to establish a *prima facie* case of hostile work environment based on race or sex under Title VII or ELCRA, Plaintiff must show: (1) she encountered unwelcome harassment; (2) the harassment was based on race or sex; (3) the harassing behavior was severe or pervasive enough to affect the terms, conditions, or privileges of employment, and (4) Ford knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999); *Haynie v. Michigan Dep't of State Police,* 468 Mich. 302, 664 N.W.2d 129, 133 (Mich. 2003). Plaintiff cannot meet the second, third, or fourth elements.

**A. Plaintiff's allegations are not based on race or sex.** Allegations of harassment are not actionable if they are unrelated to protected characteristics. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000) (explaining that "it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code"); *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 471 (6th Cir. 2012) (holding conduct that is demeaning or humiliating but does not evidence hostility towards a protected class

is not actionable under Title VII or ELCRA). The Court should disregard all of Plaintiff's allegations that she cannot connect to her race or sex.[16]

**B. Plaintiff's allegations are not objectively severe or pervasive enough to survive summary judgment.** Title VII does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998). Accordingly, "petty slights, minor annoyances, and simple lack of good manners" are not actionable. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Moreover, "teasing and name-calling, while inappropriate in a professional environment, are insufficient to state a claim for [racial or] sexual harassment." *Kalich*, 679 F.3d at 471. "Only harassing conduct that is 'severe or pervasive' can produce a 'constructive alteration in the terms or conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Conduct is evaluated using an objective standard: "We refer to reactions of a reasonable employee...." *White*, 548 U.S. at 54-55.

[16] She claims, for instance, (1) co-workers "slung" panels, (2) co-workers teased her, (3) she had disputes with co-workers about the "spot" they were assigned to work, (4) supervisors had a few conversations with her about missing a part on the line, (5) a supervisor made a gesture, which she somehow perceived as both "flipping her off" and "a gang sign," (6) she experienced two incidents of lost overtime, which were unsupported and proven false, (7) there were three delays in co-workers relieving her on the line to use the restroom, which she speculated was a conspiracy, and (8) a Ford nurse allegedly argued with her about her wrist pain. (Exs. K-HH)

The Sixth Circuit has repeatedly stated that minor disputes and irritations do not amount to severe or pervasive harassment. *See, e.g., Lindsay v. Pizza Hut of Am.,* 57 F. App'x 648, 650 (6th Cir. 2003) (holding that a plaintiff could not show severe or pervasive harassment by demonstrating that "a supervisor rolled her eyes at [the plaintiff], allowed another employee to 'curse' him, and offered to wager $50 that [he] would never be a manager"); *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 344 (6th Cir. 2005) (co-workers vulgar jokes, placing a vibrating pager on the plaintiff's thigh, and pulling at the plaintiff's overalls after she told him she was wearing a thong did not constitute actionable harassment). Plaintiff's claims do not reach the threshold for a claim of actionable harassment.

Plaintiff's sexual harassment complaints consist of: (1) a claim that someone—who she cannot even confirm was a Ford employee—pushed her by the butt into an ambulance, (2) Mr. Casara, an hourly co-worker, talked about his sex life on a few occasions and showed her two sexual pictures, and (3) Mr. Jones, another hourly co-worker, made one comment of an arguably sexual nature. (Exs. K, L, N, O, V, W, Z, AA) Even assuming these allegations are true, they are not as severe or pervasive as conduct in other cases that the Sixth Circuit found insufficient to support an actionable claim.[17]

---

[17] *See, e.g., Williams v. General Motors*, 187 F.3d 553, 563 (6th Cir. 1999) (holding 15 alleged incidents of harassment, including derogatory remarks direct at the plaintiff, sexually explicit comments, comments against women in general like

Plaintiff's allegations of racial harassment have even less support. She claims: (1) Mr. Kunec asked her not to sit while on the line, (2) Mr. Kunec, based on her speculation, "doesn't like black people working here," (3) she has a "feeling" of "racism," but added nothing more, (4) Ms. Diamond told her she can't have a "buzzer" or table near the line, which she somehow interpreted as reinstituting "Jim Crow," (5) one white employee allegedly used "ear buds" as her sole support to claim the Plant's "no-cell-phone-on-the-line" rule singled her out, (6) Mr. Kunec engaged in a "racial violent act" by throwing gloves, (7) an HR manager showed his "racism" by asking her where she was from, and (8) a co-worker once talked to her "as if she were her slave" in an "ebonics overtone." (Exs. K-HH) None of these allegations or Plaintiff's other numerous slights, delays, and minor disputes are supported with evidence of racial animus or overtones. (*Id.*) Regardless, they are much less severe than the evidence of racial harassment in other cases the Sixth Circuit ruled did not meet the threshold for racial harassment.[18] Plaintiff's hostile work environment claim has no merit.

---

"slut," denial of overtime, and ostracizing the plaintiff in a myriad of circumstances insufficiently severe or pervasive).

[18] *See, e.g., Strickland v. City of Detroit*, 995 F.3d 495 (6th Cir. 2021) (allegations of co-workers making racially derogatory social media posts, camera footage showing the same, denial of desired shift assignments, and denial of training provided to white workers, was insufficiently severe or pervasive).

**C. Ford took prompt, thorough, and continuing efforts to investigate Plaintiff's complaints.** To hold an employer liable, the employer's response to coworker harassment complaints must "manifest[ ] indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 340 (6th Cir.2008). An employer's response will insulate it from liability if "it is reasonably calculated to end the harassment." *Id.* This is because "[t]he act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to charges of harassment." *McCombs v. Meijer, Inc.,* 395 F.3d 346, 353 (6th Cir. 2005). To be held liable, the indifference an employer shows must "indicate an attitude of permissiveness that amounts to discrimination." *Id.*

The record shows that Ford took numerous corrective steps. (Ex. C, ¶¶ 14-58) Ford's investigation alone was so thorough that it put an immediate end to Plaintiff's accusations about co-worker Mr. Casara and his alleged sexual comments and pictures—the only evidence she offered that could possibly support a sexual harassment claim. *Collette v. Stein–Mart, Inc.,* 126 F. App'x. 678, 686 (6th Cir. 2005) (holding the "most significant immediate measure an employer can take in response to a [] harassment complaint is to launch a prompt investigation to determine whether the complaint is justified" because, by doing so, "the employer puts all employees on notice that it takes such allegations seriously and will not

tolerate harassment in the workplace.”). Plaintiff never complained again about conduct that she found to be sexual in nature.

And although none of Plaintiff's complaints of unlawful harassment were substantiated, Ford took action to correct improper, though not illegal, workplace behaviors that violated its policies by holding a Plant-wide “Stand Down.” (Ex. C, ¶ 35) The Company thus more than fulfilled its remedial obligations by continuing to promptly investigate, involving HR professionals outside the Plant to verify the investigation's findings, and holding “zero-tolerance” training on a Plant-wide basis.[19] Ford took every reasonable action to respond to Plaintiff's complaints, and did not ignore, encourage, or condone any inappropriate or illegal conduct.

---

[19] *See, e.g., Reed-Johnson v. Montgomery Cnty. Tennessee*, 2005 WL 2044868, at *3 (M.D. Tenn. Aug. 24, 2005) (dismissing harassment claim where investigator took “hours upon hours” to investigate the complaints and then “weighed the credibility of Plaintiff's story, … the denials of the other employees” and concluded there was “no corroboration of Plaintiff's account”); *Ellison v. Clarksville Montgomery Cnty. Sch. Sys.*, 2019 WL 280982, at *14 (M.D. Tenn. Jan. 22, 2019) (“The plaintiff also appears to take issue with CMCSS's finding that her complaint was not substantiated. The court rejects that contention as well. The question is not whether CMCSS's conclusion was correct but whether it acted in good faith.”); *Mullins v. Goodyear Tire & Rubber Co.,* 291 F. App'x 744, 749 (6th Cir. 2008) (“Goodyear reacted immediately, launched a two-week investigation, interviewed the parties involved, and instructed Parker not to bother Mullins and to avoid [her work area] when it was not necessary for him to be there.”); *see also*, EEOC Enforcement Guidance: Vicarious Employer Liability (“If no determination can be made because the evidence is inconclusive, the employer should still undertake further preventive measures, such as training and monitoring.”).

Plaintiff's Title VII and ELCRA hostile environment claims should be dismissed.[20]

**III. Plaintiff cannot establish retaliation.**

The "adverse action" element of a retaliation claim requires Plaintiff to show Ford took an action that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67; *Hawkins,* 517 F.3d at 345. The Sixth Circuit also considers a "retaliatory hostile work environment" to be a form of "adverse action" and applies the same "objectively severe or pervasive" standard analyzed in Section II.B. *Khamati v. Sec'y of Dept. of the Treasury*, 557 Fed. App'x 434, 443 (6th Cir. 2014). Plaintiff's retaliation claim fails under both theories.[21]

**A. Ford took no adverse action against Plaintiff.** The "antiretaliation provision protects an individual … from retaliation that produces an injury or harm." *White*, 548 U.S. at 67. Therefore, retaliation "speak[s] of *material adversity*" and "it is important to separate significant from trivial harms"—"[a]n employee's decision

---

[20] Ford also immediately investigated Plaintiff's allegations of supervisor harassment and found them completely meritless. For a number of those allegations, Plaintiff failed to promptly report the incident—including waiting months to report Mr. Thompson's and Mr. Kunec's alleged initial comments and actions. For these reasons, Ford has satisfied the *Ellerth/Faragher* defense for claims of supervisor harassment, and the Court should disregard those allegations.

[21] It is not clear exactly what "action" Plaintiff claims was retaliatory. Her complaint alleges only "baseless disciplinary proceedings, failing to investigate…, and issuing poor performance evaluations." (ECF No. 45, ¶¶ 74, 119) But there were no disciplinary proceedings or poor performance evaluations, and Plaintiff testified she was unaware of Ford's extensive investigation. (Ex. A, 277, 307; Ex. C, ¶ 59)

to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

In *Mulvey v. Hugler*, this Court and the Sixth Circuit analyzed and rejected a "long list" of alleged adverse actions that the plaintiff claimed were retaliatory. 2017 WL 1737851, *3 (E.D. Mich. May 4, 2017), *affirmed by* 2018 WL 2771346 (6th Cir. April 3, 2018). The incidents held not to be "adverse actions" included a supervisor who (1) "scolded" the plaintiff about being late, (2) "waived hands in the air" at the plaintiff, (3) turned on fluorescent lights in the plaintiff's office (which exacerbated a severe eye problem), and (4) held multiple performance-related conversations that the plaintiff alleged were complete fabrications. *Id.*

As discussed in Section I above, Ford took no adverse action against Plaintiff. And Plaintiff's "long list" of alleged adverse actions mirror those rejected in *Mulvey*. Her claim thus lacks merit.

**B. Plaintiff cannot show a retaliatory hostile work environment.** The same standard of objective severity and pervasiveness, analyzed in Section II.B., applies to a retaliatory harassment claim. *Hawkins*, 517 F.3d at 347. Plaintiff cannot meet those standards, because (1) she fails to show evidence that the alleged "harassment" was because of her protected activity, and (2) the "harassment" was

neither severe or pervasive.[22]

Furthermore, Plaintiff cannot maintain this claim, because she fails to show that Ford "condoned, tolerated, or encouraged" harassment or made a "decision not to take action to stop [it]." *Id*. No reasonable juror could conclude that Ford's response to Plaintiff's complaints of "retaliation" was "so inadequate[ ] that the response manifests indifference or unreasonableness under the circumstances." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). Plaintiff's claim fails.

**Conclusion**

For the foregoing reasons, the Court should grant Ford's motion and dismiss this case with prejudice.

KIENBAUM HARDY VIVIANO PELTON & FORREST, P.L.C.

By: */s/ Ryan D. Bohannon*
Ryan D. Bohannon (P73394)
Attorneys for Defendant
280 N. Old Woodward Ave, Ste 400
Birmingham, MI 48009
(248) 645-0000
rbohannon@khvpf.com

Dated: May 26, 2022

[22] *See, e.g., McQuail v. Tenn. Tech. Univ.*, 69 F. Supp. 3d 701, 714 (M.D. Tenn. 2014) (a coworker's refusal to acknowledge the plaintiff's accomplishments and humiliation of the plaintiff during a faculty meeting not actionable retaliatory conduct); *Owen v. Peak*, No. 3:02cv179, 2008 WL 4449011, at *6 (S.D. Ohio Sept. 26, 2008) (embarrassing and humiliating the plaintiff, yelling at her in front of coworkers and patients, submitting false complaints about her to a supervisor, announcing her personal leave information, and other acts not sufficiently severe to support retaliation claim).

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2022, I electronically filed the foregoing F**ord Motor Company's Motion for Summary Judgment** with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*By: /s/ Ryan D. Bohannon*
Ryan D. Bohannon (P73394)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
rbohannon@khvpf.com

448704